IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue,<br>Tucson, AZ 85701, | |
| Plaintiffs, | CIVIL ACTION NO. _____ |
| v. | COMPLAINT FOR DECLARATORY AND<br>INJUNCTIVE RELIEF |
| U.S. ENVIRONMENTAL PROTECTION<br>AGENCY,<br>1200 Pennsylvania Ave., NW<br>Washington, D.C. 20460, | |
| MICHAEL REGAN, in his official capacity<br>as Administrator of the U.S. Environmental<br>Protection Agency,<br>1200 Pennsylvania Ave., NW<br>Washington, D.C. 20460, | |
| U.S. ENVIRONMENTAL PROTECTION<br>AGENCY REGION 10,<br>1200 Sixth Ave.<br>Seattle, WA 98101 | |
| MICHELLE PIRZADEH, in her official<br>capacity as Acting Regional Administrator of<br>the U.S. Environmental Protection Agency<br>Region 10,<br>1200 Sixth Ave.<br>Seattle, WA 98101, | |
| U.S. DEPARTMENT OF COMMERCE,<br>1401 Constitution Ave., NW<br>Washington, D.C. 20230, | |
| GINA M. RAIMONDO, in her official<br>capacity as Secretary of Commerce for the<br>U.S. Department of Commerce,<br>1401 Constitution Ave., NW<br>Washington, D.C. 20230, | |

U.S. DEPARTMENT OF THE INTERIOR,
1849 C Street, NW
Washington, D.C. 20240,

DEBRA HAALAND, in her official capacity
as Secretary of the U.S. Department of the
Interior,
1849 C Street, NW
Washington, D.C. 20240,

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910,

JANET COIT, in her official capacity as
Assistant Administrator for Fisheries at the
National Oceanic and Atmospheric
Administration,
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910,

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street, NW - M/S 3012
Washington, D.C. 20240,

MARTHA WILLIAMS, in her official
capacity as Director of the U.S. Fish and
Wildlife Service,
1849 C Street, NW - M/S 3012
Washington, D.C. 20240

     Defendants.

## INTRODUCTION

1.     Plaintiff, Center for Biological Diversity ("Center"), challenges the U.S.

Environmental Protection Agency's ("EPA") ongoing failure to ensure that EPA's approvals of

Washington State's limits on aquatic cyanide—a toxic compound released into waterways by a

variety of anthropogenic activities including urban stormwater runoff, industrial and municipal

discharges, deposition from air pollution, and mining—in Washington's waters will not

jeopardize the survival and recovery of endangered and threatened species or adversely modify habitat deemed essential to their survival and recovery.

2.      The Center brings this lawsuit against the above-named Defendants under section 11(g) of the Endangered Species Act ("ESA"), 16 U.S.C § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq*., for violations of section 7 of the ESA, 16 U.S.C. § 1536.

3.      Section 7(a)(2) of the ESA requires EPA to ensure that any action it authorizes "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

4.      Under the Clean Water Act ("CWA"), states must develop water quality standards that establish and then protect the desired conditions of the state's waters, and ensure, amongst other things, the protection and propagation of fish and wildlife. 33 U.S.C. § 1313(a); 40 C.F.R. § 131.2.

5.      EPA is responsible for approving such standards if it determines that they are sufficient to protect fish and wildlife. 33 U.S.C. § 1313(c)(2)(A). When doing so, EPA must comply with section 7(a)(2) of the ESA and ensure against jeopardy and adverse modification.

6.      For decades, Washington State has relied upon water quality criteria for freshwater and marine cyanide approved by EPA. EPA, however, has never completed consultation with the U.S. Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS") (collectively the "Services") to ensure against jeopardy and adverse modification as required under the ESA section 7, 16 U.S.C. § 1536(a)(2).

7.      As a result, EPA has violated and continues to violate ESA section 7 by failing to ensure that the survival of listed species is not jeopardized and that their critical habitat has not been destroyed or modified by Washington State's water quality criteria for cyanide.

8.      Unfortunately, the best available science demonstrates that Washington State's water quality criteria for cyanide jeopardize the continued existence of Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, Lower Columbia River coho salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Puget Sound steelhead, Snake River steelhead, Upper Columbia river steelhead, Upper Willamette River steelhead, Southern Resident killer whales, and bull trout; *and* adversely modify the critical habitat of Southern resident killer whales, Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Snake River steelhead, Upper Columbia river steelhead, Upper Willamette River steelhead, and bull trout—all species listed as threatened or endangered pursuant to the ESA.

9.      In addition, since EPA approved Washington State's water quality criteria for cyanide, the designation of new and revised critical habitat for species impacted by aquatic cyanide in Washington and new information on the continued decline of the listed species

impacted by Washington State's aquatic cyanide mandate the reinitiation of consultation between EPA and the Services to address the impact of the criteria on the listed species and their habitat. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(2), (4). Neither EPA nor the Services have reinitiated consultation.

10.     Consequently, the Center requests that this Court declare that Defendants' failure to consult and failure to ensure against jeopardy and adverse modification is arbitrary and capricious and in violation of the ESA and its implementing regulations, and order Defendants to promptly initiate and complete consultation on EPA's approval of Washington State's water quality criteria for cyanide.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to the citizen suit provision of the ESA. 16 U.S.C. § 1540(g)(1), (g)(2). The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq*., the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq*. The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201, 2202, 1361; and 5 U.S.C. §§ 704, 705, 706.

12.     The Center gave notice to Defendants of its intent to file suit under the ESA for the violations described in the notice and this complaint more than 60 days ago. 16 U.S.C. § 1540(g)(2). The violations complained of in the notice have not been remedied. Defendants' actions are final and ripe for review, and the Center has standing to bring these claims.

13.     Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because this civil action is brought against agencies of the United States, and

against officers and employees of the United States acting in their official capacities under the color of legal authority, and because at least one of the Defendants resides in this judicial district.

14.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## **PARTIES**

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including in Washington, D.C. The Center has more than 89,000 members, including many who reside in, explore, and enjoy the native species and ecosystems of Washington State.

16.     The Center brings this action on behalf of its members who derive aesthetic, recreational, emotional, and spiritual benefits from aquatic species, including salmonids, steelhead, sturgeon, Southern Resident killer whales, and bull trout, and their continued existence in their native habitat, including the fresh and marine waters of Washington State.

17.     The Center's members include individuals, such as Kurt Beardslee, who regularly visit natural areas occupied by the endangered and threatened species impacted by Washington State's cyanide criteria, and who seek to observe or study these species in their natural habitat. Kurt Beardslee intends to continue to visit these areas, such as Puget Sound and the native salmon and steelhead-bearing stream on his property, to observe and study them.

18.     Kurt Beardslee and other Center members derive aesthetic, recreational, inspirational, emotional, and spiritual benefits from experiencing the species impacted by Washington State's cyanide criteria approved by EPA.

19.     The aesthetic, recreational, inspirational, emotional, and spiritual interests of Kurt Beardslee and other Center members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and APA continue. These are actual, concrete injuries caused by the Defendants' violations of the ESA and APA. The relief sought will redress the Center and its members' injuries.

20.     Defendant U.S. ENVIRONMENTAL PROTECTION AGENCY is an agency of the United States charged with administering the CWA and approving Washington State's water quality criteria.

21.     Defendant MICHAEL REGAN is the Administrator of the Environmental Protection Agency. Administrator Regan is sued in his official capacity.

22.     Defendant MICHELLE PIRZADEH is Acting Regional Administrator of Region 10 of the Environmental Protection Agency. Defendant Pirzadeh is sued in her official capacity.

23.     Defendant U.S. DEPARTMENT OF COMMERCE is an agency of the United States charged with administration of the ESA for marine and anadromous species, including Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, Lower Columbia River coho salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Puget Sound steelhead, Snake River steelhead, Upper Columbia River steelhead, Upper Willamette River steelhead, and Southern Resident killer whales.

24.     Defendant GINA M. RAIMONDO is the Secretary of Commerce. Secretary Raimondo is sued in her official capacity.

25.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION is a federal agency within the Department of Commerce charged with implementing and ensuring compliance with the ESA. The Department of Commerce has delegated administration of the ESA for marine and anadromous species to the National Oceanic and Atmospheric Administration. 50 C.F.R. § 402.01(b)

26.     Defendant JANET COIT is Assistant Administrator for Fisheries. Assistant Administrator Coit is sued in her official capacity.

27.     Defendant U.S. DEPARTMENT OF THE INTERIOR is an agency of the United States charged with administering the ESA for non-marine species including bull trout.

28.     Defendant DEBRA HAALAND is the Secretary of Interior and is the federal official in whom the ESA vests final responsibility for making decisions required by and in accordance with the ESA. Secretary Haaland is sued in her official capacity.

29.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior charged with implementing and ensuring compliance with the ESA. The Secretary of the Interior has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

30.     Defendant MARTHA WILLIAMS is the Director of the U.S. Fish and Wildlife Service. Director Williams is sued in her official capacity.

## THE RELEVANT STATUTORY AND REGULATORY SCHEME

**A.    THE ENDANGERED SPECIES ACT**

31.    Enacted in 1973, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It provides a means to conserve endangered and threatened species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b).

32.    To receive the ESA's protection, a species must first be listed as "endangered" or "threatened." *Id.* at § 1533. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

33.    Recognizing the necessity of timely habitat protections for the conservation and recovery of endangered and threatened species, the ESA requires the Services to designate "critical habitat" concurrently with listing a species. *Id.* § 1533(a)(3)(A)(i), (b)(6)(C); *see also id*. § 1532(5). "Critical habitat" is essential to the species' survival and recovery. *Id.* § 1532(3), (5).

34.    Once a species is listed and critical habitat is designated, section 7 of the ESA requires federal agencies to "insure that any action authorized ... by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" critical habitat. *Id.* § 1536(a)(2). The federal agency has the burden to show that any action it authorizes or carries out will not adversely impact a listed species.

35.    An action causes jeopardy if it reasonably would be "expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An action causes "[d]estruction or adverse modification" of designated critical habitat if it causes a "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

36.     To fulfill the substantive mandates of section 7 of the ESA, action agencies (the agency undertaking or authorizing an action) must consult with the expert agency—in the case of non-marine species, FWS, and in the case of marine and anadromous species, NMFS—before undertaking actions with the potential to affect listed species or their habitat. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a), (b). If the proposed action "may affect" listed species or their critical habitats, formal consultation is required. 50 C.F.R. § 402.14(a).

37.     To complete formal consultation, FWS or NMFS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. In carrying out the consultation process, "each agency shall use the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

38.     If the biological opinion concludes that the proposed action is *not* likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but will result in the incidental take of the species, the Services must concurrently provide an "incidental take statement." 50 C.F.R. § 402.14(i). The incidental take statement must specify the impact (amount or extent) of incidental taking on the species, any "reasonable and prudent measures" the Services consider necessary or appropriate to minimize such impact, and set forth the "terms and conditions," including but not limited to reporting requirements, that must be complied with by the action agency. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

39.     The primary purpose of an incidental take statement and its measure of permissible take is to limit the amount of allowable take and provide a trigger for reinitiating consultation when the take limit has been exceeded. *See* 50 C.F.R.§ 424.16(a)(1). Compliance with the biological opinion and incidental take statement provides a safe harbor for federal agencies and others, pursuant to the biological opinion, from enforcement action under the ESA's prohibition against "take." 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a).

40.     After the procedural requirements of consultation are complete, the action agency has the ultimate duty to ensure that an activity does not jeopardize a listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(i)(3)–(4).

41.     Federal agencies are also required to report back to the Services on the action's progress and its impact on listed species in order to monitor the impacts of incidental take. 50 C.F.R. § 402.14(i)(3).

42.     In certain circumstances, the agencies must "reinitiate" consultation. Action agencies and the Services have a duty to reinitiate consultation if, amongst other things, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "a new species is listed or critical habitat designated that may be affected by the identified action." *Id.* § 402.16(a)(2), (4).

43.     Once consultation is initiated or reinitiated, section 7(d) of the ESA provides that the action agency "shall not make any irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable or prudent measures which would not violate subsection (a)(2) of [section 7]." 16 U.S.C. § 1536(d).

44.     "EPA and the Services have agreed that where information indicates an existing [water quality] standard is not adequate to avoid jeopardizing listed species, or destroying or adversely modifying designated critical habitat, EPA will work with [the relevant State] to obtain revisions in the standard, or, if necessary, revise the standards through the promulgation of federal water quality standards under section 303(c)(4)(B) of the CWA." Memorandum of Agreement Between the Environmental Protection Agency, Fish and Wildlife Service and National Marine Fisheries Service Regarding Enhanced Coordination Under the Clean Water Act and Endangered Species Act, 66 Fed. Reg. 11,202, 11,206 (Feb. 22, 2001).

**B.      THE CLEAN WATER ACT**

45.     The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, the CWA sets a "national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* § 1251(a)(2).

46.     As a part of that process, states must set water quality standards, review them every three years, and consider whether to revise them. *Id.* § 1313(c)(1). Water quality standards "consist of the designated uses of the navigable waters involved and the water quality criteria for such water based upon such uses." *Id.* § 1313(c)(2)(A).

47.     Water quality standards must include several elements, including *inter alia*: (1) one or more designated beneficial uses of a waterway; and (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants, that are necessary to protect the designated uses, including the protection of aquatic life such as threatened or endangered species. 33 U.S.C. § 1313(c)(2), (d)(4)(B); 40 C.F.R. Part 131, Subpart

B. For waters with multiple use designations, the criteria must support the most sensitive use. 40 C.F.R. § 131.11(a)(1).

48.     States are required to identify waters within their boundaries that are not attaining water quality standards. For each such impaired water, states must develop a "total maximum daily load" for the offending pollutant which when achieved will result in compliance with the water quality standard. 33 U.S.C. § 1313(d). A TMDL is thus the maximum amount of a pollutant a particular waterbody or segment can contain while still meeting water quality standards.

49.     Water quality standards are essential to the CWA's goal of pollution control as they serve as the basis for controlling pollution from "point sources" under the National Pollutant Discharge Elimination System ("NPDES") permitting program. 33 U.S.C. §§ 1311, 1316, 1342. No NPDES permit may be issued unless it can ensure compliance with water quality standards. 40 C.F.R. § 122.4(d).

50.     States have primary responsibility for reviewing, establishing, and revising water quality standards, including aquatic life criteria, for their waters. *See* 33 U.S.C. § 1313(c)(1). States frequently rely upon EPA's recommended criteria issued as guidance under CWA section 304(a), wherein EPA is required to develop, publish, and revise from time to time, "criteria for water quality accurately reflecting the latest scientific knowledge [] on the kind and extent of all identifiable effects on health and welfare[.]" *Id*. § 1314(a)(1).

51.     In addition, EPA must establish, and then may from time to time revise, a list of toxic pollutants. 33 U.S.C. § 1317(a)(1); *see also* 40 C.F.R. § 401.15 (toxic pollutant list). Once EPA has issued 304(a) recommended criteria for any of these listed pollutants, whenever a state reviews its water quality standards the state is required to adopt its own

numeric criteria for those pollutants, "the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses." 33 U.S.C. § 1313(c)(2)(B).

52.    "Cyanides" are included in EPA's list of toxic pollutants adopted pursuant to CWA section 307(a)(1). 40 C.F.R. § 401.15(23).

53.    The CWA requires that at least once every three years, states review their water quality standards and, "as appropriate," update and adopt new standards. *Id.* § 1313(c)(1). This process is called a "triennial review." States must make the results of triennial reviews available to EPA. *Id.* If a state proposes to revise or adopt new standards, such revisions or additions must be submitted to EPA to determine consistency with the CWA's requirements, and EPA must either approve or disapprove them. *Id.* § 1313(c)(2)(A), (3).

54.     EPA must notify a state within 60 days if it approves the new or revised standards. *See* 33 U.S.C. § 1313(c)(3). If EPA does not approve the state's standards, EPA must do so within 90 days and specify the changes that are needed to ensure compliance with the requirements of CWA section 303(c) and federal water quality standards regulations. *See id.*; *see also id.* § 1313(c)(4); 40 C.F.R. § 131.21. Where EPA determines that a new or revised state-submitted standard does not meet the CWA's requirements, EPA must promptly prepare and publish proposed rules with the new or revised water quality standard. 33 U.S.C. § 1313(c)(4)(A).

## C.    THE ADMINISTRATIVE PROCEDURE ACT

55.    Pursuant to the APA, any person who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702.

56.     Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA also requires a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
> . . .
> (D) without observance of procedure required by law….

*Id.* § 706(1)-(2).

## FACTUAL ALLEGATIONS

**A.    CYANIDE**

57.     Cyanide is a toxic compound released into waterways by a variety of anthropogenic activities including urban stormwater runoff, industrial and municipal discharges, deposition from air pollution, and mining. Cyanide harms animals by disrupting their metabolism and thus their ability to harness energy. As a result, an animal exposed to toxic concentrations of cyanide cannot carry out essential life functions.

58.     For example, fish subject to acute cyanide poisoning experience hypoxic hypoxia due to a lack of sufficient oxygen and display distress, increased ventilation and gill movement, surfacing, frantically swimming in circles at the surface or violently swimming at the bottom of the water column, convulsions, tremors, and ultimately death.

59.     Cyanide at lower concentrations can also have profoundly harmful effects such as impaired growth, swimming ability, food capture, and metabolic rate. Exposure to sublethal concentrations of cyanide can interrupt fish migration patterns, impede predator avoidance, influence aggressiveness, interrupt ion regulation, and cause tissue necrosis. Exposure

concentrations below those that kill fish can also impact reproduction and population persistence by reducing the number of eggs spawned by females, reducing the hatchability of spawned eggs, and reducing the survival of young fish through the first year.

60.    Abiotic factors in the environment can amplify the toxicity of cyanide. For example, both high and low temperatures can increase the toxicity of cyanide in fish species, as does low dissolved oxygen and more acidic pH.

61.    Other toxics in the environment can act synergistically with cyanide, resulting in greater negative impact than would be expected based on the additive effects of the toxics.

62.    The harm to fish species from repeated exposure to cyanide can be cumulative.

**B.    EPA'S APPROVAL OF WASHINGTON STATE'S CYANIDE CRITERIA**

63.    On or about November 25, 1992, the Washington State Department of Ecology ("Ecology") submitted freshwater acute (22.0 µg/L) and chronic (5.2 µg/L) criteria and a marine acute criterion (1.0 µg/L) for cyanide to EPA for approval.[1]

64.    On or about March 18, 1993, EPA approved these criteria under the CWA.

65.    On December 22, 1992, EPA promulgated the "National Toxics Rule." 57 Fed. Reg. 60,848 (Dec. 22, 1992). Because Ecology had never submitted a marine chronic criterion for cyanide to EPA for approval, Washington State was included in EPA's promulgation of water quality standards in the National Toxics Rule for marine chronic cyanide. These criteria took effect in Washington on February 5, 1993.

66.    In 1997, Ecology revised and submitted to EPA cyanide water quality criteria for marine waters *inside* Puget Sound (2.8 µg/L acute and 9.1 µg/L chronic).

---

[1] µg/L stands for micrograms per liter.

67.     In 1998, EPA approved Washington State's revisions of the acute and chronic cyanide water quality criteria for marine waters within Puget Sound. EPA stated that its approval under the CWA was conditional upon the outcome of the ESA consultations with the Services.

68.     On August 1, 2003, Washington State submitted a numeric chronic criterion for marine cyanide outside of Puget Sound of 1.0 µg/L to EPA for approval. This criterion is identical to the one set forth in the National Toxics Rule.

69.     On May 23, 2007, EPA approved Washington State's water quality criterion for chronic marine cyanide outside of Puget Sound, conditioned on the outcome of ESA section 7 consultation.

**C.    EPA'S FAILURE TO COMPLY WITH THE ENDANGERED SPECIES ACT WHEN APPROVING WASHINGTON STATE'S CYANIDE CRITERIA**

70.     With respect to EPA's approval of Washington State's cyanide criteria for freshwater, on information and belief, EPA did not consult with the Services pursuant to section 7 of the ESA on its approval of the criteria in 1993.

71.     Regarding EPA's 1998 approval of Washington State's marine cyanide criteria for areas within Puget Sound, by letter dated June 27, 2001, EPA initiated consultation with the Services.

72.     In July 2002, EPA transmitted a draft biological assessment to the Services addressing EPA's 1998 conditional approval of Washington State's revisions of the acute and chronic cyanide water quality criteria for marine waters within Puget Sound. EPA asserted that the Puget Sound cyanide criteria were not likely to adversely affect ESA-listed fish and bird species, but that they may be likely to adversely affect the humpback whale, Steller sea lion, and leatherback sea turtle.

73.     On information and belief, the Services never issued biological opinions on these decisions and these consultation processes remain uncompleted.

74.     On March 23, 2007, EPA initiate consultation with the Services on its proposed recommended water quality criteria developed pursuant to section 304(a) of the CWA ("National Consultation"). The National Consultation on these proposed criteria was intended to satisfy the agency's duty to consult and ensure against jeopardy and adverse modification pursuant to ESA section 7(a)(2) for states and tribes that adopted standards consistent with or more stringent than the nationally recommended 304(a) aquatic life criteria.

75.     When EPA conditioned its approval of Washington State's water quality criterion for chronic marine cyanide outside of Puget Sound in 2007, it specifically verified the intent to rely on the National Consultation to satisfy its duty to consult with the Services.

76.     The proposed recommended standards under consideration in the National Consultation were functionally identical to Washington State's freshwater acute criterion of 22.0 µg/L, freshwater chronic criterion of 5.2 µg/L, and marine acute and chronic criteria for waters outside of Puget Sound of 1.015 µg/L.

77.     Washington State's marine acute and chronic criteria for Puget Sound were not to be covered by the National Consultation because they are less protective than EPA's recommended criteria. *See* WAC 173-201A-240mm (setting criteria of 9.1 µg/L and 2.8 µg/L for acute and chronic exposure respectively for marine waters within Puget Sound).

78.     As part of the National Consultation, FWS produced a draft BiOp on January 15, 2010, and NMFS produced a draft BiOp on April 27, 2010.

79.     In their draft BiOps, both of the Services concluded that EPA's proposed approvals of state or tribal water quality criteria consistent with the nationally recommended

304(a) aquatic life criteria for cyanide—such as Washington State's freshwater and marine acute and chronic water quality criteria for cyanide outside of Puget Sound—were likely to jeopardize the continued existence of numerous listed species native to Washington State and adversely modify their critical habitat. *See* NMFS, *DRAFT Endangered Species Act Section 7 Consultation Biological Opinion & Conference Opinion On the U.S. Environmental Protection Agency's Approval of State or Tribal, or Federal Numeric Water Quality Standards for Cyanide Based on EPA's Recommended 304(a) Aquatic Life Criteria* (April 27, 2010) ("NMFS draft BiOp") at 272; FWS, *DRAFT Biological Opinion on EPA's Proposed Program of Continuing Approval or Promulgation of New Cyanide Criteria in State and Tribal Water Quality Standards* (January 15, 2010) ("FWS Draft BiOp") at 298–300.

80.    Specifically, the NMFS draft BiOp found that EPA's approval of state or tribal water quality standards identical to EPA's nationwide section 304(a) aquatic life criteria for cyanide is "likely to jeopardize the continued existence" of numerous species native to Washington State, such as the Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, Lower Columbia River coho salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Puget Sound steelhead, Snake River steelhead, Upper Columbia River steelhead, Upper Willamette River steelhead, and Southern Resident killer whales. NMFS draft BiOp at 272.

81.    Further, NMFS concluded the water quality standards for cyanide approved by EPA are "likely to destroy or adversely modify designated critical habitat" for the Southern

resident killer whale, Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Snake River steelhead, Upper Columbia River steelhead, and Upper Willamette River steelhead. *Id.*

82.    FWS, in its draft BiOp, stated that "EPA's continuing approval of state water quality standards that rely on their nationally recommended criteria for cyanide," would "likely . . . jeopardize the continued existence of . . . the bull trout," another species native to Washington State, among other species. FWS Draft BiOp at 298.

83.    Further, the FWS draft BiOp stated that "EPA's continuing approval of state water quality standards that rely on their nationally recommended criteria for cyanide . . . is likely to result in the destruction or adverse modification of critical habitat of . . . bull trout," among other species. *Id.* 300.

84.    Following the issuance of the Services' draft biological opinions finding jeopardy and adverse modification for numerous listed species, EPA withdrew from its National Consultation on May 4, 2016. In doing so, EPA terminated its efforts to consult with the Services on its approval of Washington State's cyanide water quality criteria for freshwater and marine waters outside of Puget Sound. When terminating this consultation process EPA did not initiate a new consultation process or explain how it would comply with section 7 of the ESA regarding its approval of Washington State's water quality criteria for cyanide.

85.     As a result of this and its failure to conclude consultation regarding Washington

State's cyanide water quality criteria for marine waters within Puget Sound, EPA has not

completed section 7 consultation on any of Washington State's cyanide water quality criteria.

**D.     NEW CRITICAL HABITAT DESIGNATIONS IMPACTED BY EPA'S APPROVAL OF WASHINGTON STATE'S CYANIDE CRITERIA**

86.     On February 24, 2016, NMFS issued a final rule designating critical habitat for

Lower Columbia River coho salmon (*Oncorhynchus kisutch*) and Puget Sound steelhead

(*Oncorhynchus mykiss*). Designation of Critical Habitat for Lower Columbia River Coho Salmon

and Puget Sound Steelhead, 81 Fed. Reg. 9252 (Feb. 24, 2016) *codified* at 50 C.F.R. § 226.212.

Both designations include waters governed by Washington State's water quality standards. When

doing so, NMFS specifically noted that EPA's approval of water quality standards is the type of

activity that may affect the critical habitat and would be subject to the requirements of section 7

of the ESA. *Id.* at 9273.

87.     NMFS issued a final rule revising the critical habitat designation for the Southern

Resident killer whale (*Orsinas orca*) distinct population segment on August 2, 2021, in part to

ensure sufficient water quality to support the growth and development of individual killer

whales. Revision of Critical Habitat for the Southern Resident Killer Whale Distinct Population

Segment, 86 Fed. Reg. 41,668, 41,679–80 (Aug. 2, 2021). The designation includes waters

governed by Washington State's water quality standards.

88.     NMFS noted that the whale's survival and recovery required abundant Chinook

salmon—their preferred food source. However, Chinook salmon are adversely impacted by

aquatic cyanide. *Id.* As a result, NMFS found that human activities "that could increase water

contamination and/or chemical exposure," and "decrease the quantity or quality of prey,"

including from point sources pollution in the Coastal Washington area, were "activities of

primary concern because of their potential effects … and that should be considered in accordance with section 7….” *Id.* at 41,683.

## E.    NEW INFORMATION REGARDING THE IMPACTS OF CYANIDE ON LISTED SPECIES AND THEIR CRITICAL HABITAT

89.    Several species have suffered steep population declines since EPA approved Washington State's cyanide criteria. The currently precipitously small population sizes for these species amplifies the harmful effects aquatic cyanide has on the species' remaining populations and critical habitats.

90.    For example, the 2021 total Puget Sound Chinook run size (hatchery and wild, not including spring Chinook) is estimated to be down 11 percent from the prior year's forecast and two percent below the recent 10-year average. Further—and far worse—the most recent 10-year average for wild Puget Sound chinook is 24 percent below the 10-year average recorded for Puget Sound chinook in 1999 when the species was listed under the ESA. Washington State's Department of Fish and Wildlife has predicted that Puget Sound chinook populations will be less than 25 percent of the recovery goal.

91.    Lake Ozette Sockeye, Snake River spring/summer Chinook, Puget Sound steelhead, and Upper Columbia spring Chinook, are also in crisis, with populations projected to reach less than 25 percent of the recovery goal in the near future.

92.    Most of the populations of the Columbia River chum salmon evolutionarily significant unit are at very low abundances.

93.    Bull trout populations are also decreasing.

94.    Today, there are only 73 Southern Resident killer whales remaining, down from 78 individuals in 2016 when NMFS completed its last five-year review, and 97 individuals in

1996, the year before Washington State proposed its current marine cyanide criteria for Puget Sound.

95.     As the primary food source for Southern Resident killer whales, the continued decline in Chinook salmon populations contributes to and exacerbates the whale's continued decline.

96.     The continued decline of these species places them at higher risk of entering "extinction vortices," where environmental and biological forces function differently than in large populations. These forces can result in feedback loops that drive small populations towards extinction.

97.     The factors driving these "extinction vortices" include increased vulnerability to stochastic impacts, Allee effects on population dynamics, genetic deterioration from inbreeding and genetic drift, increased vulnerability to environmental stressors, such as pollution, and synergistic impacts.

98.     Because of the continued declines and increasingly low abundances of the above-mentioned species, these species are at disproportionately greater risk of extinction than when EPA and the Services first began consultation on Washington State's cyanide water quality criteria. Therefore, the impact of cyanide upon the persistence of these populations is different than a decade or two ago.

99.     In addition, new scientific information indicates that accelerating climate change impacts are also likely to amplify the toxicity of cyanide on fish. As a result, standards promulgated by Ecology and approved by EPA in the 1990s and 2000s may not be adequately protective today.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**EPA's Violation of Section 7 of the ESA**

**Failure to Insure Against Jeopardy and Adverse Modification**

100.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

101.    Under section 7 of the ESA, EPA has an ongoing duty to ensure that its actions are not jeopardizing the continued existence of endangered and threatened species or resulting in the destruction or adverse modification of their designated critical habitat. 16 U.S.C. § 1536(a)(2).

102.    The actions subject to the ESA's requirements are broadly defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," including "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

103.    EPA must comply with the requirements of section 7 of the ESA, 16 U.S.C. § 1536(a)(2), when carrying out its duties to review and approve or disapprove a state's proposed water quality standards, 33 U.S.C. § 1313(c)(2)-(4).

104.    Unless a determination is made through informal consultation with the Services or by preparation of a biological assessment in which the Services concur, the action agency must engage in formal consultation with the Services. 50 C.F.R. § 402.14(a).

105.    In 1993, EPA approved Washington State's freshwater acute and chronic criteria and marine acute criterion for marine waters exclusive of Puget Sound. In 1998, EPA conditionally approved Washington State's marine acute and chronic criteria for waters inside

Puget Sound. And in 2007 EPA approved Washington State's marine chronic criterion for waters exclusive of Puget Sound.

106.    EPA has never completed consultation with the Services regarding its approval of Washington State's aquatic cyanide criteria to ensure that EPA's authorization of those criteria is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of the critical habitat of such species.

107.    The best available science demonstrates that Washington State's aquatic cyanide criteria, approved by EPA: (1) jeopardize the continued existence of Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, Lower Columbia River coho salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Puget Sound steelhead, Snake River steelhead, Upper Columbia river steelhead, Upper Willamette River steelhead, Southern Resident killer whales, and bull trout; and (2) adversely modify the critical habitat of Southern resident killer whales, Lower Columbia River Chinook salmon, Upper Columbia River spring-run Chinook salmon, Puget Sound Chinook salmon, Snake River fall-run Chinook salmon, Snake River spring/summer-run Chinook salmon, Upper Willamette River Chinook salmon, Columbia River chum salmon, Hood Canal summer-run chum salmon, southern green sturgeon, Lake Ozette sockeye salmon, Snake River sockeye salmon, Lower Columbia River steelhead, Middle Columbia River steelhead, Snake River steelhead, Upper Columbia river steelhead, Upper Willamette River steelhead, and bull trout.

108.    By approving Washington State's water quality criteria for cyanide, and by failing to pursue and complete section 7 consultation with the Services regarding its approval of Washington State's aquatic cyanide criteria, EPA is failing to ensure that the actions authorized by it are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of habitat of such species. 16 U.S.C. § 1536(a)(2).

109.    EPA's failure to act violates its mandatory duty under section 7 of the ESA, 16 U.S.C. 1540(g)(1)(A), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (1), (2)(A).

## SECOND CLAIM FOR RELIEF

### EPA's Violation of the APA and Section 7 of the ESA

### Withdrawal From Consultation

110.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

111.    Under section 7 of the ESA, EPA has an ongoing duty to ensure that its actions are not jeopardizing the continued existence of endangered and threatened species or resulting in the destruction or adverse modification of their designated critical habitat. 16 U.S.C. § 1536(a)(2).

112.    The actions subject to the ESA's requirements are broadly defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," including "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

113.    EPA must comply with the requirements of section 7 of the ESA, 16 U.S.C. §

1536(a)(2), when carrying out its duties to review and approve or disapprove a state's proposed

water quality standards. 33 U.S.C. § 1313(c)(2)-(4).

114.    Unless a determination is made through informal consultation with the Services or

by preparation of a biological assessment in which the Services concur, the action agency must

engage in formal consultation with the Services. 50 C.F.R. § 402.14(a).

115.    In 1993, EPA approved Washington State's freshwater acute and chronic criteria

and marine acute criterion for marine waters exclusive of Puget Sound. In 2007, EPA approved

Washington State's marine chronic criterion for waters exclusive of Puget Sound. When doing

so, EPA conditioned its approval subject to the results of Section 7 consultation.

116.    Rather than engage in consultation specific to Washington State's water quality

criteria for cyanide, EPA initiated consultation with the Services on EPA's section 304(a)

recommended aquatic life water quality criteria for cyanide. According to EPA, this "provide[s]

ESA section 7 coverage for any water quality criteria for cyanide included in State or Tribal

water quality standards approved ... by EPA that are equal to or more stringent than the

nationally recommended section 304(a) criteria." U.S. Envtl. Prot. Agency, Re: Initiation of

Formal Consultation on EPA's Clean Water Act Section 304(a) Recommended Aquatic Life

Criteria for Cyanide (Mar. 23, 2007). Such consultation, if completed, may have satisfied the

procedural elements of section 7 of the ESA with respect to EPA's approval of Washington

State's cyanide water quality standards for freshwater and marine waters outside of Puget Sound

as they are identical to EPA's section 304(a) recommended aquatic life water quality criteria for

cyanide.

117.     EPA never completed consultation on its recommended aquatic life water quality criteria for cyanide. Instead, in 2016, EPA withdrew from consultation without explanation as to how it intended to comply with its duties under section 7 of the ESA regarding its approvals of Washington State's water quality criteria for cyanide.

118.     By withdrawing from section 7 consultation with the Services, EPA violated its mandatory duty to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of habitat of such species, in consultation with the Services. 16 U.S.C. § 1536(a)(2).

119.     EPA's withdrawal from consultation violates its mandatory duty under section 7 of the ESA, 16 U.S.C. 1540(g)(1)(A), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (1), (2)(A).

## THIRD CLAIM FOR RELIEF

### EPA and the Services' Violation of Section 7 of the ESA

### Failure to Reinitiate Consultation Following the Designation and Revision of Critical Habitat

120.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

121.     Under the ESA, an agency must reinitiate consultation if new critical habitat is designated or if the critical habitat of a listed species is revised if that critical habitat may be affected by the agency's action. 50 C.F.R. § 402.16(a)(4).

122.     In 2016, NMFS designated critical habitat for lower Columbia River coho salmon and Puget Sound steelhead. In 2021, NMFS revised the critical habitat designation for the Southern Resident killer whale distinct population segment.

123.    The Services and EPA's failure to reinitiate consultation following these new and

revised designations of critical habitat for endangered and threatened species violates section 7

of the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.16(a)(4).

124.    EPA's failure to act violates the ESA, 16 U.S.C. 1540(g)(1)(A), and EPA and the

Services' failure is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5

U.S.C. § 706 (1), (2)(A).

## FOURTH CLAIM FOR RELIEF

### EPA and the Services' Violation of Section 7 of the ESA

### Failure to Reinitiate Consultation Following New Information Regarding the Impacts of Washington State's Aquatic Cyanide Criteria on Listed Species and Designated Critical Habitat

125.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

126.    Under the ESA, an action agency and the Services must reinitiate consultation

whenever new information reveals effects of the action that may affect the species or its critical

habitat in a manner or to an extent not previously considered. 50 C.F.R. § 402.16(a)(2).

127.    Since EPA approved Washington State's aquatic cyanide criteria, numerous listed

species including, but not limited to, Southern Resident killer whale, Chinook salmon, and bull

trout have declined precipitously, and current population counts are much smaller than they were

at the time of the approval of the criteria.

128.    These extremely small population sizes represent new information regarding the

impacts of Washington State's aquatic cyanide criteria on listed species because the dynamics of

small populations are different than those of large populations. The impact of cyanide at the

concentrations identified in the approved criteria is likely to have a more pronounced impact on population persistence for these species.

129.    Further, recent scientific studies provide new information about the harmful effects of aquatic cyanide, including as a result of the impact of climate change on the temperature and acidity of bodies of water, indicating that the previously approved criteria may have a more harmful impact as climate change accelerates the alteration of bodies of water across Washington.

130.    The Services and EPA's failure to reinitiate consultation given this new information violates section 7 of the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.16(a)(2).

131.    EPA's failure to act violates the ESA, 16 U.S.C. 1540(g)(1)(A), and EPA and the Services' failure is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (1), (2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**A.**    Declare that EPA is violating 16 U.S.C. § 1536(a)(2) by failing to ensure that its approvals of Washington State's aquatic cyanide criteria are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of the habitat of such species;

**B.**    Declare that EPA's termination of consultation with the Services is arbitrary and capricious, an abuse of discretion, and/or not in accordance with the law;

**C.**     Order EPA to immediately initiate consultation with the Services regarding EPA's approvals of Washington State's aquatic cyanide criteria and to complete such consultation by a date certain;

**D.**     Declare that NMFS, FWS, and EPA are violating 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.16(a)(2), (4), by failing to reinitiate consultation regarding the approval of Washington State's aquatic cyanide criteria in light of new information regarding the impacts of Washington State's aquatic cyanide criteria on listed species and designated critical habitat, and in light of new and revised critical habitat designations;

**E.**     Order EPA and the Services to immediately reinitiate consultation in light of new information regarding the impacts of Washington State's aquatic cyanide criteria on listed species and designated critical habitat, and in light of new and revised critical habitat designations, and to complete such consultation by a date certain;

**F.**     Award the Center its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*; and

**G.**     Grant such further relief as the Court deems just and proper.

DATED this day of February 24, 2022

                                        Respectfully submitted,

                                        */s/ Ryan Adair Shannon*
                                        Ryan Adair Shannon (D.C. Bar No. OR0007)
                                        Center for Biological Diversity
                                        P.O. Box 11374
                                        Portland, OR 97211
                                        (503) 283-5474
                                        Fax: (503) 283-5528
                                        rshannon@biologicaldiversity.org

Jennifer D. Calkins (*pro hac vice pending*)
Western Environmental Law Center
1402 3rd Avenue, Suite 1022
Seattle, WA 98101
(206) 607-9867
calkins@westernlaw.org

Andrew Hawley (*pro hac vice pending*)
Western Environmental Law Center
1402 3rd Avenue, Suite 1022
Seattle, WA 98101
(206) 487-7250
hawley@westernlaw.org

*Counsel for the Center for Biological Diversity*